UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NEON ENTERPRISE SOFTWARE, LLC | § | |
| | § | |
| *Plaintiff-Counterclaim Defendant*, | § | |
| v. | § | Case No. 1:09-CV-00896-JRN |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION | § | |
| | § | |
| *Defendant-Counterclaim Plaintiff*. | § | |

## IBM'S AMENDED ANSWER AND COUNTERCLAIMS

International Business Machines Corporation ("IBM") respectfully submits this amended answer and counterclaims in response to the First Amended Complaint of Neon Enterprise Software, LLC ("Neon").

### SUMMARY OF THE ACTION

1.      This case is about Neon's attempted hijacking of IBM's intellectual property. Neon's business model expressly depends upon Neon inducing IBM's customers to violate their agreements with IBM.  In this respect, it is no different than that of a crafty technician who promises, for a fee, to rig your cable box so you can watch premium TV channels without paying the cable company.  Even if it could be accomplished technically, it is neither lawful nor ethical.

2.      At the crux of this dispute lies Neon's product, "zPrime", a software program devised to misappropriate IBM's intellectual property.  IBM makes mainframe computers and sells them to sophisticated customers around the world.  Along with mainframe computers, IBM licenses its mainframe software in exchange for licensing fees.  In many instances, the IBM software licenses provide for charges based on use.  IBM provides software licenses that allow customers to meet their processing needs at a reasonable cost, and customers pay IBM a fee

linked to their usage.  This framework of licensing intellectual property for a price is reflected in contracts between IBM and its customers, is well known in the industry, and is, of course, fully supported by an established body of law.

3.      Neon seeks to upset this pricing balance and entice IBM customers to breach their licensing agreements with IBM.  Neon openly advertises zPrime as designed to enable IBM customers to use computer processing capacity *beyond* that which they are contractually authorized to use *for free*, without paying required fees to IBM.  Neon actively encourages IBM's customers to use zPrime to get more processing capacity, much more, than they have paid IBM to receive.  Part of Neon's scheme is to suggest falsely to IBM customers that IBM approved zPrime or condoned what zPrime does.  In fact, however, Neon knows perfectly well that IBM customers will violate the terms of their contracts by using zPrime.

4.      Indeed, Neon has candidly admitted its objectives.  Its CEO boasted that any savings zPrime generates "would come out of IBM's pocket".  Neon's director for Europe admitted that zPrime "goes against what IBM intended their systems to do".  Neon is even willing to be paid for its product with a portion of the fees misappropriated from IBM.

5.      All of this adds up to a business scheme that violates federal and state law.  Neon has tortiously interfered with the contracts between IBM and its customers, and Neon has breached its own agreements with IBM.  Neon has infringed IBM's copyrights, creating unauthorized copies of IBM programs, and induced customers to do the same.  Likewise, Neon has violated the Digital Millennium Copyright Act, 17 U.S.C. § 1201(b) (the "DMCA"), by trafficking in software designed to facilitate infringement and circumvent technological measures in IBM's mainframe computer systems.  And, in the process of trying to divert fees owed to IBM into its own pockets, Neon has violated the Lanham Act by falsely representing the nature and

characteristics of zPrime.  IBM seeks damages and injunctive and punitive relief to address these violations.

6.      Despite Neon's disclaimer in its original complaint that this is not a case about a purported "monopoly", now after only two months, during which no discovery has been conducted, Neon claims violations of various antitrust laws.  To do this, it engages in distortions of economic concepts fundamental to any antitrust case.  The reality is that IBM faces vigorous competition from many lawful competitors in the marketplace.  Neon is not one of them.  Neon is a parasite attempting to improperly profit from IBM's investment of billions of dollars over the past decade to create and improve its System z offerings.  These offerings have made IBM the most competitive and innovative company in the marketplace.  Its substantial investment is entitled to judicial protection from Neon's attempted piracy.

7.      Neon's complaint is meritless and should be dismissed in its entirety, and the Court should award damages and injunctive relief to IBM pursuant to the counterclaims set forth below.

## IBM'S COUNTERCLAIMS

8.      For its counterclaims, IBM alleges as follows.

## Jurisdiction and Venue

9.      This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1338(a) and 1367(a), 17 U.S.C. §§ 501 and 1201(b) and 15 U.S.C. § 1125(a).

10.     Neon has submitted to the personal jurisdiction of this Court by bringing this action.

11.     Venue is proper because Neon brought this action and thereby consented to venue.  Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(c) and 28 U.S.C. § 1400(a).

### Parties

12.     IBM is a corporation organized and existing under the laws of New York and having its principal place of business in Armonk, NY.  IBM designs, manufactures, sells and licenses computer hardware and software, and provides related services.

13.     Neon is a Delaware Limited Liability Company with its principal place of business in Austin, TX.  Neon is a software developer, specializing in products for IBM mainframe computing environments.

### Overview

14.     IBM offers a number of options to customers to improve the cost-effectiveness of running their workloads on IBM mainframe computers.  Relevant here, in the early 2000s, IBM introduced two specialty processors:  the System z Application Assist Processor ("zAAP") and the System z Integrated Information Processor ("zIIP").  IBM offers these specialty processors at prices substantially lower than the prices of its general purpose processors and does not charge software usage fees for the processing capacity consumed by workloads running on the specialty processors.  In exchange, customers agree to run only limited types of workloads on specialty processors.  The IBM License Agreement for Machine Code ("Machine Code License"), among other agreements and documents, sets forth this restriction on the usage of specialty processors.  IBM's mainframe computer systems implement this restriction by directing only IBM-authorized workloads to specialty processors for execution.

15.     This lawsuit arises out of Neon's sales and marketing of its zPrime software product.  zPrime exists for only one purpose:  to enable IBM's customers to circumvent the contractual and technological limitations on their use of zAAP and zIIP specialty processors. This damages IBM in at least two ways.  First, zPrime converts limited purpose specialty processors sold at a discount into higher-priced general purpose processors, so that customers can help themselves to processing capacity that they have not paid for and are not authorized to use.  Second, zPrime diverts workloads from general purpose processors to specialty processors, permitting customers to run IBM's copyrighted software programs on zAAPs and zIIPs without authorization, and thus to avoid paying software licensing fees owed to IBM.

## Background

16.     IBM designs, manufactures and sells IBM mainframe computers—highly reliable, available and secure computers that are used for a variety of types of work—and operating systems and other software for use with such computers.  IBM mainframe computers can host large databases and process thousands of transactions per second.  IBM's customers use them to handle a wide range of tasks, such as customer-order processing, financial transactions, production and inventory control and payroll management.  IBM's current line of mainframe computers comprises its System z models, the most recent being the System z10 computers.

17.     Like any computer, an IBM mainframe computer contains various hardware components, including processors (which perform computations and execute instructions) and memory (which stores data used by the computer on a short-term basis).

18.     IBM mainframe computers implement certain important functions in a type of code variously called "Machine Code" or "Licensed Internal Code" ("LIC").  IBM does not sell

Machine Code, but rather licenses customers to use Machine Code through its Machine Code License.

19.     An IBM mainframe computer runs one or more operating systems.  An operating system ("OS") controls the execution of programs and provides services such as resource allocation, scheduling, input/output control and data management.  IBM's primary proprietary operating system for its mainframe computers is called "z/OS".  z/OS includes, among other things, the following elements:  (1) Time Sharing Option Extensions ("TSO/E"), which assist in writing and running programs that are operated from user workstations and share the use of the computer system with other programs; (2) Language Environment ("LE"), which provides a set of services that are used by programs written in a variety of high-level programming languages; and (3) Interactive Systems Productivity Facility ("ISPF"), which helps users develop programs and provides a variety of services used by such programs.

20.     Application software programs perform specific functions for users, such as database queries or payroll management.  IBM provides a number of widely used programs, and third-party developers called Independent Software Vendors ("ISVs") have created others. Among the software provided by IBM are specialized programs, generally referred to as "middleware" programs, whose primary purpose is to provide services to customer application programs.  The middleware programs provided by IBM for its System z machines include its Customer Information Control System ("CICS"), its Information Management System ("IMS") and its DB2 products.  These products provide customer application programs with services to create and manage transaction-processing applications (*e.g.*, handling a transaction such as obtaining cash from an ATM) and services to create, access and manage large collections of data, called "databases".

### System z Hardware Configurations

21.    IBM manufactures each IBM mainframe computer with a complement of processors and memory.

22.    A given customer may not require all the processors and memory built into an IBM mainframe computer to handle the customer's overall amount of computing work.  IBM therefore enables customers to match their computing capacity to their needs by paying for and activating only a subset of the processors and memory physically included in the mainframe computer.  Only the processors and memory paid for and activated can be used by the customer. The processors and memory not activated remain dormant until the customer purchases the right to activate and use them.  As a customer's needs increase, the customer may obtain additional computing power conveniently and seamlessly.  The customer simply purchases from IBM authorizations to access and use additional processors and/or memory, and IBM activates those additional resources.  This capability is sometimes referred to as "capacity on demand".  It reflects substantial investment and innovation by IBM and allows customers to reconfigure their IBM mainframe computers more efficiently and less expensively than was previously the case.

23.    In addition to configuring the number of active processors and the amount of active memory, customers can choose to activate general purpose processors to operate at different speeds (*i.e.*, at full speed for full price or at a range of reduced speeds for reduced prices).  IBM customers can also choose to activate processors as general purpose processors, known as "general purpose engines" or "central processors" ("CPs"), or, alternatively, customers may choose to activate processors as limited purpose "specialty engines" or "specialty processors", at reduced prices.

24.     IBM licenses its customers to use IBM Machine Code to process all types of computing jobs ("workloads") on CPs.  In contrast, customers are authorized to process only certain specified types of workloads on specialty processors.  z/OS directs to specialty engines only those certain specified types of workloads that customers are contractually permitted to process on specialty processors.

25.     In view of the limited uses that customers may make of specialty processors, IBM offers specialty processors at prices substantially lower than the prices of CPs.  The types of workloads that customers are authorized to process on specialty processors, and that z/OS directs to such processors (often referred to as "new workloads"), typically require substantially more processing power than do other types of workloads (often referred to as "legacy workloads" or "traditional workloads"), to accomplish the same amount of work or transactions.  With specialty processors, customers can acquire the additional processing power they need for these new, processing-intensive workloads at attractive prices.  IBM's pricing of specialty processors enables IBM mainframe computer systems to process new workloads at prices that are competitive with the prices of both new workloads on other computer server platforms and traditional workloads on IBM mainframe computer systems.

26.     Neon's zPrime software interferes with the normal and intended operation of IBM mainframe computer systems by enabling customers to use specialty processors beyond the extent of their IBM authorizations.  zPrime thus improperly allows customers to misappropriate computing capacity for which they have not paid.

## IBM System z Software Licensing

27.     IBM offers a large number of software products for System z computers. Examples of IBM software products relevant to this action include IBM's IMS, CICS, DB2 and z/OS operating system.

28.     Many IBM software products for the System z, including IMS, CICS, DB2 and z/OS, are licensed to users in exchange for monthly license charges ("MLCs").

29.     IBM offers various MLC-based software pricing plans for customers, some based on the aggregate active processing capacity of CPs, or alternatively, the measured level of actual utilization (by all running programs) of active processing capacity on CPs.

30.     When the customer has chosen to have the price of MLC software products calculated based on the measured level of actual CP utilization, the processing capacity consumed by workloads running on specialty processors is not included in the calculation of MLCs.   Therefore, any improper shifting of software processing from CPs to specialty processors will improperly reduce the MLCs for all utilization-based MLC products running on those CPs.

## zAAP and zIIP Specialty Processors

31.     As part of IBM's longstanding and ongoing efforts to reduce the total costs of mainframe ownership for its customers, IBM has introduced a variety of specialty processors. The specialty processors at issue here are the zAAP and the zIIP.

32.     IBM introduced the zAAP in 2004 to enable users to run software written in Java (a web-oriented programming language) cost-effectively on their System z mainframe computers.  IBM subsequently expanded the scope of allowable zAAP workloads.

33.     IBM introduced the zIIP in 2006 to enable users to run certain other workloads (specifically, certain workloads that use enclave SRBs) more cost-effectively on their System z mainframe computers.  Subsequently, IBM has expanded the scope of allowable zIIP workloads.

34.     IBM's contracts with its customers provide that customers may process only certain types of workloads on zAAPs and zIIPs.  Specifically, when a customer acquires an IBM System z mainframe computer, the customer's use of that computer and its Machine Code is subject to an IBM Machine Code License, which provides that the customer may not use the "Built-in-Capacity" of the computer beyond the extent of authorizations obtained from IBM.  In addition, a customer's use of a System z mainframe computer system is typically subject to an IBM Customer Agreement ("ICA") that governs the customer relationship and includes licenses to certain IBM software products, and Purchase Supplements that detail provisions specific to each sales transaction between the customer and IBM.

35.     IBM also has consistently made clear in its point-of-sale communications, product announcements, technical support documents, product usage guides, System z capacity-planning resources and other communications both in print and on its website that customers are authorized to process only certain specified types of workloads on zAAPs and zIIPs.  System z customers understand that they are contractually authorized by IBM to use zAAPs, zIIPs and the associated Machine Code to process only those limited types of workloads specified by IBM.

36.     IBM has implemented technological measures, including a switch-to service, or "switch routine", and a dispatcher, in IBM's z/OS code and LIC, that ensure that only those types of workloads that customers are authorized to process on zAAPs and zIIPs are directed to such specialty processors for execution.

**zPrime**

37.     In June 2009, Neon introduced its zPrime product.  zPrime subverts the z/OS switch-to service and dispatcher to redirect types of workloads that customers are not contractually permitted to process on specialty processors from CPs to zAAP and zIIP specialty processors in contravention of the terms of applicable agreements between IBM and its customers.  The sole purpose of zPrime is to facilitate IBM customers' use of computing resources for which they have not paid and to avoid charges they owe to IBM.

38.     The purpose of zPrime is evident from Neon's own statements.  For example, Neon states on its website:

> "NEON zPrime makes some of your most costly workloads eligible for processing on a specialty processor—the transaction work associated with your business applications, potentially saving your organization millions of dollars in software and hardware costs."  (http://www.neon.com/solutions/zprime.shtm.)

> "zPrime™ creates an environment that allows work from the System z central processors (CP) to be handled by specialty processors, reducing usage-based costs.  The reduction in CPU cycles allows you to save on both hardware and software budgets."  (http://neon.com/doc/ds/zP_ds.pdf.)

39.     Neon CEO Lacy H. Edwards acknowledged in a recent New York Times blog article that "[a] lot of the savings [zPrime] customers are getting would come out of I.B.M.'s pocket".

40.     Neon's scheme depends on inducing IBM's customers to breach their agreements with IBM, and it does so in at least two ways.  First, zPrime enables customers to appropriate general-purpose computing capacity that they did not purchase and are contractually prohibited from accessing and using, costing IBM hardware sales and maintenance revenues.  Second, by allowing customers improperly to process unauthorized workloads on specialty engines, zPrime facilitates customers' avoidance of monthly software charges owed to IBM.

41.     Neon has knowledge of IBM's contracts with its customers.  Neon is itself an IBM mainframe customer, is a Machine Code licensee and has executed an ICA with IBM. Neon knows that other IBM customers are parties to agreements with IBM that are similar to Neon's own agreements with IBM.  Indeed, Neon has discussed the existence and terms of those agreements with its customers.

42.     Neon has intentionally and improperly caused customers' breaches of their agreements with IBM.  Neon knows that by installing and using zPrime, customers violate their contractual obligations to IBM.   zPrime's only purpose is to facilitate customers' misappropriation of computing capacity from IBM and their avoidance of payment of fees they owe to IBM by transferring ineligible workloads to specialty processors.  As Neon's director for Europe, Thilo Rockmann, admitted in a recent news article, zPrime "goes against what IBM intended their systems to do".

43.     Moreover, in at least one pricing option offered for zPrime, customers pay Neon a portion of the fees misappropriated from IBM as the price of using zPrime.  Thus, Neon was motivated to seek, and has intentionally sought, customer breaches for its own economic advantage.

44.     Neon has made false and misleading statements in its advertising and promotional materials to influence consumers to buy zPrime and to induce IBM customers to use zPrime in breach of their contracts with IBM.  For example:

(a)     Neon has falsely stated or implied that Neon developed zPrime with IBM's consent and approval, including, without limitation, in:

       (i)        a July 15, 2009 webinar presentation to prospective customers describing the history of zPrime as beginning with an agreement between Neon and IBM; and

       (ii)      a June 30, 2009 press release stating that "NEON zPrime is 100 percent compliant with IBM specifications, rules and conditions for System z processor access".

(b)      Neon has falsely stated or implied that there are no IBM contracts that relate to limitations on the types of workloads that may be processed on zAAP and zIIP specialty processors, including, without limitation, in:

       (i)        a public statement by Neon's CEO Lacy Edwards in a July 30, 2009 news article that Neon "was not aware of any license agreements that limit or restrict specialty engines";

       (ii)      a September 23, 2009 webinar presentation to prospective customers where Neon representative Wayne Webb stated that "publicly available IBM contract forms . . . do not define authorized workloads" ; and

       (iii)     a December 2009 promotional document entitled "Neon zPrime— Business and Legal: The Answer Book" stating that "[t]here is no specific definition of authorized or eligible workloads in IBM contracts or legal agreements".

(c)      Neon has falsely stated or implied that numerous customers are using zPrime, including, without limitation, in:

       (i)        a July 29, 2009 press release stating that "more than 50 companies are in various stages of testing [zPrime] today";

13

(ii)     a November 2, 2009 press release stating that "14 companies are now in production with zPrime, using it to offload business-critical applications and programs to zIIPs and zAAPs"; and

(iii)    a December 2009 promotional document entitled "Neon zPrime— Business and Legal: The Answer Book", stating that "[c]ustomers have recognized cost savings through reduced monthly workload licensing charges and upgrade avoidance".

(d)     Neon has falsely stated or implied that the workloads zPrime distributes to specialty processors are authorized by IBM, including, without limitation, in:

(i)      Neon's June 2009 zPrime information sheet for prospective customers stating that "[w]ith a simple installation and configuration process, you enable NEON zPrime to automatically distribute all eligible mainframe workload to specialty processors"; and

(ii)     a September 23, 2009 webinar to prospective customers, where Stephen Heffner assured potential customers that zPrime does not interfere with the operation of z/OS.

(e)     Neon has falsely stated or implied that IBM customers' use of zPrime would not violate IBM's customer agreements or licenses, including, without limitation, in:

(i)      multiple public statements by Neon's CEO, Lacy Edwards (*e.g.*, in July 30, 2009 and October 7, 2009 news articles) that Neon has not violated IBM's intellectual property rights or licensing arrangements;

(ii)     statements by Edwards and Neon representative Wayne Webb to the same effect in a September 23, 2009 webinar to prospective customers;

14

(iii)    Neon's June 30, 2009 press release describing zPrime as "100 percent compliant" with IBM rules and conditions;

(iv)    Neon's October 1, 2009 press release stating that "zPrime is legal to use, free of any intellectual property infringements, and based on customers' legal reviews, has not jeopardized any standard contracts customers have with IBM"; and

(v)    Neon's November 2, 2009 press release stating that zPrime "legally gives mainframe users more control over IT investments while substantially reducing mainframe costs".

**Neon's Tortious Interference and Breach of Contract**

45.    Neon has tortiously interfered with IBM's contracts with its customers.  One example illustrating how Neon has misled IBM's customers and induced them to breach their contracts with IBM is Highmark, Inc. ("Highmark").  Highmark executed an ICA with IBM on January 27, 2004.  In June 2006, Highmark purchased two zIIP specialty processors from IBM for use in its System z9 Enterprise Class mainframe computer.  Highmark also purchased two additional zIIP specialty processors in April 2008.

46.    The version of the Machine Code License that applies to Highmark's zIIPs grants Highmark "a nonexclusive license to use LIC . . . only to the extent of IBM authorizations [Highmark has] acquired for access to and use of Built-in-Capacity".  The Machine Code License states that "Built-in-Capacity is protected by certain technological measures in LIC" and that Highmark "agree[s] to IBM's implementation of such technological measures to protect Built-in-Capacity".  The License prohibits Highmark from circumventing those technological measures, or otherwise "access[ing] or us[ing] unauthorized Built-in-Capacity".  If Highmark

15

should exceed the extent of IBM authorizations for use of Built-in-Capacity, it agrees "to pay IBM or (if applicable) an authorized IBM reseller the full price of permanent, unrestricted use of the Built-in-Capacity at the then current price".

47.     "Built-in-Capacity" is defined as "computing resources or capabilities" included in a "Specific Machine" that "are to remain inactive, or whose use is restricted, until the right to access and use the resources or capabilities is properly acquired for the Specific Machine directly from IBM or through an authorized IBM reseller".  "Built-in-Capacity" specifically includes "processors" and "workload-specific resources or capabilities", and thus, by definition, includes specialty processors such as zAAPs and zIIPs.

48.     Highmark's ICA states that the Machine Code in its machines is licensed "under the terms of the agreement provided with the Machine Code" and "only for the capacity and capability for which [Highmark is] authorized by IBM in writing and for which payment is received by IBM".

49.     The ICA further provides:  "[i]f you make changes to your environment that impact use charges (for example, change processor size or configuration for Programs), you agree to promptly notify IBM and pay any applicable charges".

50.     Finally, the ICA provides that IBM software products may be used only "to the extent of authorizations [the customer has] obtained".

51.     In connection with its zIIP purchases, Highmark also executed Order Letters on June 9, 2006 and April 30, 2008.  These letters state that the Machine Code is "licensed under the terms of the agreement[] provided with the . . . LIC and [that agreement] govern[s] Highmark's use of that . . . LIC".  The Order Letters also set forth the number and types of processors, and thus the processing capacity, that Highmark has acquired and is authorized to

16

use.  They also state that "Highmark agrees to comply with any other terms between Highmark and IBM, including, but not limited to, those that relate to Machine capacity".  The Order Letters state that additional terms for the products listed in the letters may be contained in Purchase Supplements, which are part of the Order Letters.  These Purchase Supplements similarly state that the Machine Code is licensed under the terms of the agreements provided with the Machine Code and set forth the number and types of processors, and thus the processing capacity, that Highmark has acquired and is authorized to use.

52.     Neon induced Highmark to install and use zPrime on its IBM mainframes to execute unauthorized workloads on specialty processors.  Neon thereby induced Highmark to appropriate general-purpose computing capacity for which it did not pay.  This is a breach of the Machine Code License.  The Machine Code License grants Highmark a license to use Machine Code "only to the extent of IBM authorizations [Highmark has] acquired for access to and use of Built-in-Capacity".  By using zPrime to execute workloads on a specialty processor beyond those that are authorized by IBM, Highmark used Machine Code beyond "the extent of IBM authorizations" and accessed and used unauthorized Built-in-Capacity, all in breach of the Machine Code License.

53.     Neon also induced Highmark to use zPrime in breach of its ICA.  The ICA provides:  "[i]f you make changes to your environment that impact use charges (for example, change processor size or configuration for Programs), you agree to promptly notify IBM and pay any applicable charges".  Installing zPrime on a System z mainframe is a change to the machine's operating environment that impacts usage charges, and doing so without notifying IBM of this change or paying the applicable charges was a breach of the ICA.  In addition, the ICA provides that IBM software products may be used only "to the extent of authorizations

17

[Highmark has] obtained".  Neon induced Highmark to use IBM software products on specialty processors without authorization, in breach of this provision.

54.     Neon knew of Highmark's contractual obligations to IBM, and it intentionally induced Highmark to breach its agreements with IBM as described above.

55.     As a result of Neon's interference, IBM has suffered not only direct, pecuniary losses, but also damage to its goodwill among customers.  IBM enjoys an outstanding reputation for the quality of its products and has developed considerable goodwill among computer users.  IBM's reputation and goodwill depend in large part on maintaining the high quality of its products and fair, predictable pricing programs.  To achieve those goals, IBM expends substantial time, money and effort in the design and development of its products and usage plans.  Neon's actions directly and adversely impact IBM's goodwill among its customers.  The loss of goodwill will be exacerbated should IBM have to enforce its contractual rights against its customers to remedy and prevent losses from zPrime's introduction into System z environments.

56.     In addition, Neon has used, and is continuing to use, zPrime on its own System z mainframe computer.  Neon is therefore directly breaching its own Machine Code License and ICA with IBM.

### Neon's Copyright Infringement and Violation of the DMCA

57.     IBM holds valid copyrights in and to the software programs at issue in this action, and these programs are protected via the following copyright registration numbers:

| IBM Product | Release | Registration Number |
|---|---|---|
| CICS Transaction Server Version 2 | 1 | TX5437957 |
| | 2 | TX5492430 |
| | 2 | TX5554570 |
| | 2 | TX5541372 |
| | 2 | TX5816467 |
| | 2 | TX5902987 |
| | 3 | TX5915178 |

18

| IBM Product | Release | Registration Number |
|---|---|---|
| CICS Transaction Server Version 3 | 1 | TX6183635 |
| | 1 | TX6321112 |
| | 1 | TX6500389 |
| | 1 | TX6853448 |
| | 1 | TX6304334 |
| | 2 | TX6861614 |
| | 2 | TX6891140 |
| | 2 | TX6891559 |
| | 2 | TX6898115 |
| | PK45354 | TX6860260 |
| DB2 Version 7 | 1 | TX5384011 |
| DB2 Version 8 | 1 | TX5992590 |
| DB2 Version 9 | 1 | TX6571910 |
| | 1 | TX6891799 |
| IMS Version 7 | 1 | TX5262593 |
| IMS Version 8 | 1 | TX5653883 |
| IMS Version 9 | 1 | TX6102485 |
| IMS Version 10 | 1 | TX6891093 |
| z/OS Version 1 (including ISPF, LE and TSO/E components) | 6 | TX0006037031 |
| | 7 | TX0006266402 |
| | 8 | TX0006438572 |
| | 9 | TX0006825346 |
| | 10 | TX0006876632 |

58.    These copyrights were duly and properly registered with the United States Copyright Office and IBM has duly and legally complied in all respects with the provisions of the copyright laws of the United States with respect to these copyrights.

59.    In addition, the Copyright Office has received completed applications, deposits and fees for IBM's CICS Transaction Server Version 4, IMS Version 11 and z/OS Version 1 release 11 ISPF, LE and TSO/E components.

60.    When an IBM mainframe computer executes a program, it copies the program code into its random-access memory, which is shared among multiple processors within the mainframe computer.  When a processor, such as a zIIP, executes a program, it also copies the program code into the processor's own cache memory.

61.     zPrime allows customer application programs to run on specialty processors.  The customer application programs, in turn, invoke IBM services provided by CICS, IMS, DB2, z/OS (including the particular ISPF, LE and TSO/E components of z/OS) and other IBM software.  This causes these IBM software products also to run on specialty processors, without IBM's authorization.  Running an IBM software product on a specialty processor results in a copy of the program code being made in the specialty processor's cache memory.  That copy is unauthorized, and making such an unauthorized copy is copyright infringement.

62.     When an IBM software product runs as an unauthorized workload on a specialty processor, the cached copy of the program code is unlicensed.  ICAs generally (including Highmark's) grant the customer a license to use IBM software products only "to the extent of authorizations Customer has obtained" and to "make and install copies of the ICA Program, to support the level of use authorized".  Similarly, Neon's ICA restricts the use of IBM software products such that use "may not exceed the total number of users or amount of resource authorized".  When a customer executes ineligible software on a specialty processor, it exceeds the authorizations it has obtained from IBM (as discussed above) and operates outside the scope of the applicable software license.

63.     By selling zPrime, Neon intentionally enables and induces customers to process unauthorized workloads, including IBM software products, on specialty processors, thereby inducing, causing and materially contributing to IBM customers' infringement of IBM's copyrights.  Neon itself has also directly infringed IBM's copyrights by operating zPrime on IBM System z mainframes, running unauthorized workloads on specialty processors and causing IBM software product code to be copied into specialty processors' cache memories without authorization.

64.     IBM controls access to and use of zAAP and zIIP specialty engines (including the copying of IBM software product code into the cache memories of those specialty engines) through the switch-to service, or "switch routine", and dispatcher in z/OS code and through LIC. These technological measures are narrowly tailored such that they protect IBM's copyrights and prevent the copying of otherwise ineligible program code, including IBM software product code, to specialty processor caches.  zPrime is primarily designed and produced for the purpose of circumventing the protection afforded by IBM's technological measures.

65.     zPrime has no other commercially significant purpose than to circumvent the protection afforded by z/OS and cause IBM customers to execute ineligible workloads on specialty processors, thereby copying program code to specialty processors' cache memories without authorization, in violation of IBM's copyrights and in breach of the terms of their agreements with IBM.

66.     Neon manufactures, offers to the public, provides and otherwise traffics in zPrime.

<u>**Counterclaim I**</u>

<u>**(Tortious Interference with Contract)**</u>

67.     Paragraphs 1-66 are incorporated herein by reference.

68.     IBM has entered into valid contracts, including Machine Code Licenses, ICAs and Purchase Supplements, with System z customers, including Highmark.

69.     By using zPrime, IBM customers, including Highmark, breach their Machine Code Licenses and/or ICAs.

70.     Neon had knowledge of IBM's contracts with Highmark.

71.     Neon intentionally, improperly and without justification procured breaches of Highmark's Machine Code License and ICA, as detailed herein.

72.     As a direct and proximate result of Neon's intentional actions and Highmark's breaches of its Machine Code License and ICA, IBM has suffered and will continue to suffer damages in an amount to be determined at trial.

## Counterclaim II

### (Breach of Contract)

73.     Paragraphs 1-66 are incorporated herein by reference.

74.     Neon's ICA and the Machine Code License applicable to Neon's z10 mainframe constitute valid contracts.  IBM has duly performed all the conditions of the contracts required of it.

75.     Neon has breached the Machine Code License.  The version of the Machine Code License applicable to Neon's z10 mainframe grants Neon a license to use Machine Code "only to the extent of IBM authorizations that Licensee has acquired for access to and use of Built-in-Capacity".  In addition, Neon "agree[d] to use Machine Code only as authorized" by IBM.  By using zPrime to execute unauthorized workloads on zAAP and zIIP specialty processors, Neon is using Machine Code beyond "the extent of IBM authorizations" and accessing and using Built-in-Capacity without paying for it, all in breach of the Machine Code License.

76.     Neon also has breached its ICA.  Section 1.4 of the ICA provides:

> "One-time and recurring charges may be based on measurements of actual or authorized use (for example, number of users or processor size for Programs and meter readings for Maintenance Services).  You agree to promptly notify us and pay any applicable charges if you change the basis of measurement for usage based charges."

By using zPrime on its z10 mainframe, Neon has made changes to the basis of measurement for usage based charges without promptly notifying IBM or paying applicable charges.

22

77.     As a direct and proximate result of Neon's breaches of the ICA and the Machine Code License, IBM has suffered damages in an amount to be determined at trial.

## Counterclaim III

### (Violation of the Digital Millennium Copyright Act)

78.     Paragraphs 1-66 are incorporated herein by reference.

79.     Neon manufactures, offers to the public, provides and otherwise traffics in zPrime.

80.     Neon designed and produces zPrime primarily for the purpose of circumventing protection afforded by IBM's technological measures that effectively protect IBM's copyrights in its program code.  By running zPrime, IBM customers unlawfully copy IBM's copyrighted program code to specialty processors' caches without authorization, thereby committing copyright infringement.

81.     zPrime has no commercially significant purpose or use other than to circumvent the protection afforded by IBM's technological measures.

82.     Neon markets zPrime for use in circumventing the protection afforded by IBM's technological measures.

83.     Neon's actions as set forth above constitute violations of the DMCA, 17 U.S.C. § 1201(b).

84.     IBM has been damaged as a result of Neon's DMCA violations in an amount as yet undetermined, and will continue to be injured to the extent Neon continues to sell and market zPrime.  IBM is therefore entitled to the remedies provided in 17 U.S.C. § 1203.

## Counterclaim IV

### (Copyright Infringement)

85.     Paragraphs 1-66 are incorporated herein by reference.

86.     IBM is, and at all relevant times has been, the exclusive owner of rights under United States copyright law in and to its licensed program code, including IMS, CICS, DB2, z/OS (including ISPF, LE and TSO/E elements) and other IBM software program code.

87.     Neon has infringed IBM's copyrights in and to its licensed program code, including its IMS, CICS, DB2, z/OS (including ISPF, LE and TSO/E elements) and other IBM software program code, by unlawfully copying this code to the caches of IBM specialty processors.

88.     Neon has also contributed to and/or induced the infringement of IBM's copyrights in and to its licensed program code, including its IMS, CICS, DB2, z/OS (including ISPF, LE and TSO/E elements) and other IBM software program code, by causing or materially contributing to IBM customers' unlawful copying of such code to the caches of IBM specialty processors with knowledge that such copying constituted infringement.

89.     The infringement of each of IBM's rights in and to its copyrighted program code constitutes a separate and distinct act of infringement.

90.     Neon's actions as set forth above constitute direct and indirect infringement of IBM's copyrights and exclusive rights under copyright in violation of 17 U.S.C. § 106 and 17 U.S.C. § 501.

91.     Neon knows that IBM owns valid copyrights in its licensed program code, including its IMS, CICS, DB2, z/OS (including ISPF, LE and TSO/E elements) and other IBM software program code, and Neon knows that it does not have authorization to exploit IBM's copyrighted works.  Neon's infringement is therefore willful.

24

92.     IBM has been damaged as a result of Neon's copyright infringement in an amount as yet undetermined, and will continue to be injured in this same way to the extent Neon continues to use and induce others to use IBM's licensed program code, including its IMS, CICS, DB2, z/OS (including ISPF, LE and TSO/E elements) and other IBM software program code. IBM is therefore entitled to the remedies provided in 17 U.S.C. § 501 *et seq.*

93.     Unless Neon is enjoined by this Court from continuing its infringement of IBM's copyrights, IBM will suffer additional irreparable harm and impairment of the value of its rights. IBM is thus entitled to an injunction against further infringement under 17 U.S.C. § 502.

## Counterclaim V

## (Violations of the Lanham Act)

94.     Paragraphs 1-66 are incorporated herein by reference.

95.     Neon has made, and is making, false or misleading statements regarding zPrime to an intended audience consisting of IBM's customers.  These statements constitute commercial speech (*i.e.*, commercial advertising and promotion), and were made by Neon for the purpose of influencing IBM's customers to buy zPrime.

96.     Neon's false or misleading statements have deceived, or have the tendency to deceive, a substantial portion of Neon's intended audience of IBM's customers into believing that:

(a)     Neon developed zPrime with IBM's consent and approval;

(b)     there are no IBM contracts relating to limitations on the types of workloads that may be processed on zAAP and zIIP specialty processors;

(c)     numerous customers are using zPrime;

(d)      the workloads zPrime distributes to specialty processors are IBM-authorized; and

(e)      customers' use of zPrime would not violate IBM's customer agreements or licenses.

97.      Neon's false statements mischaracterize fundamental characteristics of zPrime and Neon's commercial activities.  In addition, these statements are material in that they are intended to, and in fact did, have a direct effect on customers' purchasing decisions.  Customers would not have purchased zPrime if not for Neon's false representations concerning zPrime.

98.      Neon has advertised, offered and/or sold zPrime through interstate commerce.

99.      As a direct and proximate result of Neon's actions, IBM has suffered and will continue to suffer injury in terms of reduced software usage fees, general purpose central processor sales and maintenance fees, and loss of goodwill.

100.     Neon's actions violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

101.     This is an "exceptional case" in which the Court should award IBM reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## Counterclaim VI

### (Claim for Attorneys' Fees)

102.     Paragraphs 1-66 are incorporated herein by reference.

103.     As a result of Neon's wrongful actions as described above, IBM has retained counsel to prosecute its claims and is entitled to recover its reasonable and necessary attorneys' fees under Chapter 38.001 *et seq*. of the Texas Civil Practice and Remedies Code.

104.     In addition, as noted above, IBM should be awarded its reasonable attorneys' fees associated with this action pursuant to 17 U.S.C. § 1203(b), 17 U.S.C. § 505 and 15 U.S.C. § 1117(a).

## IBM's Answer to Neon's Amended Complaint[1]

105.    IBM denies the allegations of paragraph 1, except states as follows.[2] Most legacy workloads or traditional workloads are programs written specifically for IBM mainframe computers (though they can be moved to other platforms). IBM licenses its software for customer use, and many customers pay ongoing licensing fees in accordance with those licenses. With zPrime, Neon unlawfully seeks to plunder IBM's business by enabling customers to appropriate general-purpose computing capacity that they did not purchase and are contractually prohibited from accessing and using, costing IBM hardware sales and maintenance revenues, and by enabling customers illegitimately to process unauthorized workloads on specialty engines, thus facilitating customers' avoidance of monthly software charges owed to IBM. IBM is without knowledge or information sufficient to form a belief as to the truth of the allegations of the sixth sentence of paragraph 1.

106.    IBM denies the allegations of paragraph 2, except states as follows. IBM's contracts limit the use of computing capacity in IBM mainframe computers, as described in IBM's counterclaims. Neon requested identification of IBM customer agreements that would be violated by zPrime use, and in a letter dated October 27, 2009, IBM informed Neon that use of zPrime would violate specific provisions of IBM's Machine Code License.

107.    IBM denies the allegations of paragraph 3.

108.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of paragraph 4.

---

[1] IBM denies any allegations that may appear in headings and footnotes of Neon's Complaint, unless they are specifically addressed *infra*.

[2] All references to "paragraph _" in IBM's Answer to Neon's Amended Complaint (*i.e.*, ¶¶ 105-209) refer to paragraphs in Plaintiff's First Amended Complaint.

109.    IBM admits the allegations of paragraph 5.

110.    IBM admits the allegations of paragraph 6.

111.    IBM denies the allegations of paragraph 7 except states that venue is proper in this Court under 28 U.S.C. § 1391(b), that IBM has a number of employees in the Austin area and that Neon purports to have its principal office in Travis County, Texas.

112.    IBM admits the allegations of paragraph 8.

113.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9, except states that Neon has sold software for IBM mainframe computers and that Neon offers certain utilities for IBM mainframe computers that compete with IBM products.

114.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 10 except states that many of the largest companies in the world use IBM mainframes and denies the allegations of the second, third and fourth sentences of paragraph 10.

115.    IBM denies the allegations of the first and second sentences of paragraph 11, except refers to the statements referenced in paragraph 11 for the contents thereof.  IBM denies the allegations of the third, fourth and fifth sentences of paragraph 11, except states that IBM has mainframe computer customers worldwide, including in Texas, California and New York.

116.    IBM denies the allegations of paragraph 12, except states as follows.  IBM markets a line of products under the names zSeries and System z.  There are a number of pricing plans available to IBM's customers, which may include up-front fees and ongoing software licensing fees for particular products.  Many IBM software products for the System z are licensed to customers in exchange for MLCs, and IBM offers various MLC-based software

pricing plans for customers, some based on the aggregate active processing capacity, or alternatively, the measured level of utilization (by all running programs) of active processing capacity on CPs.

117.    IBM denies the allegations of paragraph 13, except states as follows.  Most legacy workloads or traditional workloads are programs written specifically for IBM mainframe computers (though they can be moved to other platforms or replaced with applications that run on other platforms).  Other programs are sometimes referred to as new workloads.  While new workloads can be processed on both IBM mainframe computers and non-IBM mainframe computer platforms, new workloads are typically less efficient when run on IBM mainframe computers and typically require substantially more processing power than traditional workloads to accomplish the same amount of work.  Consequently, new workloads are more costly to run on CPs than traditional workloads.

118.    IBM denies the allegations of paragraph 14 except states as follows.  IBM began offering zAAP specialty processors in 2004 and zIIP specialty processors in 2006 as part of its longstanding and ongoing efforts to reduce the total costs of mainframe ownership for its customers and to make it more cost-effective for customers to run comparatively inefficient new workloads on IBM mainframe computers.  IBM customers may activate no more than one zAAP and one zIIP for each activated CP.  If a customer later upgrades its mainframe system, it retains the right to use any specialty processors purchased with the earlier version of that system.

119.    IBM denies the allegations of paragraph 15, except refers to the statements referenced in paragraph 15 for the contents thereof and states as follows.  zAAP and zIIP specialty processors are differentiated from CPs and are subject to contractual provisions and technological measures, such that customers are authorized to process only certain specified

types of workloads on these specialty processors.  In view of the limited uses that customers may make of specialty processors, IBM offers specialty processors at prices substantially lower than the prices of CPs.  IBM currently does not include the processing capacity consumed by workloads properly running on specialty processors in the calculation used to compute utilization-based MLCs for IBM software.  In addition, customers that do not need full-capacity CPs can purchase CPs from IBM that have had their capacity limited, a process sometimes referred to as "kneecapping", thereby saving in up-front costs.  IBM lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence in footnote 5, and denies the balance of the allegations in footnote 5.

120.   IBM denies the allegations of paragraph 16, except refers to the statements referenced in paragraph 16 for the contents thereof and states as follows.  IBM's z/OS operating system together with LIC ensures that only those types of workloads that customers are contractually authorized by IBM to process on zAAPs and zIIPs are directed to such specialty processors for execution.  In addition, licensed ISVs may use an IBM-supplied application programming interface ("API") to enable their software to run on zIIP processors.  The statements referred to in paragraph 16 relate to this API.  According to Neon, zPrime does not use the API.

121.   IBM denies the allegations of paragraph 17, except refers to the statement referenced in paragraph 17 for the contents thereof and states that there are contractual and technological limits on the use of zAAP and zIIP specialty processors as further described in IBM's counterclaims.

122.   IBM denies the allegations of paragraph 18, except states as follows.  Specialty processors are differentiated in fundamental ways via IBM's Licensed Internal Code.  The ability

to alter the "personality" of processors (*i.e.*, their function and performance characteristics) via code is an innovation in which IBM has invested significant resources.  By virtue of this innovation, IBM can enable processors to perform different, specialized functions without having to produce different types of hardware, which would be more expensive.

123.    IBM denies the allegations of paragraph 19, except states as follows.  IBM enables customers to match their computing capacity to their needs by paying for and activating only a subset of the processors physically included in the mainframe computer.  IBM customers can choose to activate processors as general-purpose CPs or as limited purpose specialty processors.  Specialty processors are differentiated from CPs and are subject to contractual provisions and technological measures, such that customers are authorized to process only certain specified types of workloads on these specialty processors.  Accordingly, IBM offers specialty processors at prices substantially lower than the prices of CPs and IBM currently does not include the processing capacity consumed by workloads properly running on specialty processors in the calculation used to compute utilization-based MLCs for IBM software.  IBM makes zAAP and zIIP specialty processors available as part of its longstanding and ongoing efforts to reduce the total costs of mainframe ownership for its customers and to make it more cost-effective for customers to run comparatively inefficient new workloads on IBM mainframe computers.

124.    IBM denies the allegations of paragraph 20.

125.    IBM denies the allegations of paragraph 21, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first, second and third sentences of paragraph 21.

126.    IBM denies the allegations of paragraph 22.

127.    IBM denies the allegations of paragraph 23, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 23.

128.    IBM denies the allegations of paragraph 24, except refers to the statement referenced in paragraph 24 for the contents thereof.

129.    IBM denies the allegations of paragraph 25, except refers to the consent decree it entered into with the Department of Justice effective January 25, 1956 (the "Consent Decree") for its contents and states as follows.  IBM entered into an agreement with the Department of Justice to terminate the remaining applicable portions of the Consent Decree effective May 1, 1997.  The United States District Court for the Southern District of New York and the Court of Appeals for the Second Circuit agreed that the decree should be terminated.

130.    IBM denies the allegations of paragraph 26.

131.    IBM denies the allegations of paragraph 27, except refers to the New York complaint referenced in paragraph 27 for the contents thereof.

132.    IBM denies the allegations of paragraph 28, except refers to the web pages referenced in paragraph 28 for the contents thereof.

133.    IBM denies the allegations of paragraph 29, except states as follows.  Jim Stracka was arrested by the Federal Bureau of Investigation on charges of extortion.  He later brought a lawsuit against IBM, which the parties settled.

134.    IBM denies the allegations of paragraph 30, except refers to the statements referenced in paragraph 30 for the contents thereof.

135.    IBM denies the allegations of paragraph 31, except states that in July 2008 it settled a lawsuit against PSI for patent infringement, breach of contract and other causes of

action in the United States District Court for the Southern District of New York after acquiring PSI.

136.    IBM denies the allegations of paragraph 32 and states that it has acted in an entirely lawful manner to protect its legal rights against violations by Neon as detailed in IBM's counterclaims.

137.    IBM denies the allegations of paragraph 33, except states that IBM provides support for customers that have purchased IBM products, and many IBM customers upgrade their IBM products from time to time.

138.    IBM denies the allegations of paragraph 34, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the third sentence of paragraph 34.

139.    IBM denies the allegations of paragraph 35.

140.    IBM denies the allegations of paragraph 36, except that Neon purports to contend that the relevant geographic market is world-wide.

141.    IBM denies the allegations of paragraph 37.

142.    IBM denies the allegations of paragraph 38.

143.    IBM denies the allegations of the second and third sentences of paragraph 39.

144.    IBM denies the allegations of paragraph 40 and states as follows.  IBM customers are not locked in to IBM mainframe computers.  The task of migrating applications from one platform to another requires customers to take certain steps.  Many customers have taken those steps and migrated off IBM's mainframe computer platform.  IBM further states that IBM mainframe computers use Extended Binary Coded Decimal Interchange Code ("EBCDIC") rather than the American Standard Code for Information Interchange ("ASCII"), IMS databases

are hierarchical, and Common Business-Oriented Language ("COBOL") is one of the languages used on IBM mainframes and is one of the oldest programming languages.

145.    IBM denies the allegations of paragraph 41, except states as follows.  IBM has licensed certain mainframe operating systems for use on computers made by other manufacturers, known as "plug-compatible manufacturers" ("PCMs").  IBM and PCMs faced increasing competition from manufacturers of other computer servers, often referred to as "distributed systems", that perform the same functions.  PCMs ultimately chose to stop making IBM-compatible computers at least in part because of the belief that the IBM mainframe could not compete with distributed systems.  By contrast, IBM responded to the competition by investing billions of dollars to improve its mainframes.  These investments allowed IBM to introduce, in 2000, the System z line of mainframes, which featured substantial improvements over prior products.  In order to preserve the value of its investments, including its System z technology and the z/OS operating system, IBM lawfully protects its technology via intellectual property rights.  IBM does not license the z/OS operating system for use on non-IBM products that IBM believes infringe its patents and other intellectual property.  IBM continues to face strong competition.

146.    IBM denies the allegations of paragraph 42.

147.    IBM denies the allegations of paragraph 43, except states as follows.  IBM mainframe computers employ proprietary technological measures to ensure that only those workloads that customers are contractually authorized by IBM to process on zAAPs and zIIPs are directed to such specialty processors for execution.  One such measure is the "switch routine", or "switch-to service", in the z/OS operating system.  The switch routine consists of code that is part of the z/OS operating system and is not offered by IBM independent of the

operating system.  Customers can structure their acquisition of System z hardware products in a variety of ways, including by leasing hardware from third parties.

148.    IBM denies the allegations of the first, second, third and sixth sentences of paragraph 44, except states as follows.  As a customer increases its use of IBM mainframes, the customer may approach the limits of the processing capacity it has purchased from IBM.  In order to meet customers' needs, IBM offers the ability to purchase authorizations for additional capacity as needed.  Customers can purchase authorizations for processors of various speeds and types, at different price points.  This arrangement is beneficial and convenient for customers and reflects substantial investment and innovation by IBM.  IBM states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences of paragraph 44.

149.    IBM denies the allegations of paragraph 45.

150.    IBM denies the allegations of paragraph 46, except states that Neon offers certain utilities for IBM mainframe computers that compete with IBM products.

151.    IBM denies the allegations of paragraph 47.

152.    IBM denies the allegations of paragraph 48.

153.    IBM denies the allegations of paragraph 49.

154.    IBM denies the allegations of paragraph 50.

155.    IBM denies the allegations of paragraph 51, except states as follows.  IBM, in its discretion, offers certain discounts to certain IBM business partners or software developers. IBM is under no obligation to provide discounts to any IBM business partners or software developers, including companies such as Neon that, rather than partnering with IBM, are seeking to sabotage it by undermining its business and pirating its revenues and intellectual property.

156.    IBM denies the allegations of paragraph 52, except states that Neon has sold utilities for IBM mainframe computers.

157.    IBM denies the allegations of paragraph 53, except refers to the statement referenced in paragraph 53 for the contents thereof and states as follows.  IBM is under no obligation to provide discounts to companies such as Neon and has denied requests for discounts from time to time.  IBM notified Neon of one such denial on September 23, 2009.

158.    IBM denies the allegations of paragraph 54.

159.    IBM denies the allegations of paragraph 55, except states that obtaining advance releases of IBM's software can aid developers in creating utilities and tools for IBM mainframe computers and software.

160.    IBM denies the allegations of the first sentence of paragraph 56.  IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of paragraph 56, except states that the quoted language has appeared in exhibits to IBM Vendor Access Agreements since before Neon introduced zPrime.

161.    IBM denies the allegations of paragraph 57.

162.    IBM denies the allegations of paragraph 58.

163.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of paragraph 59.

164.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60, except states as follows.  In August 2009, IBM declined an application from Neon to exhibit at the IBM System z Expo, and in September 2009, IBM requested that Neon not attend an IBM-sponsored DB2 User Group Meeting.  IBM is under no obligation to offer invitations to IBM-sponsored events to any companies, including

companies such as Neon that, rather than partnering with IBM, are seeking to sabotage it by undermining its business and pirating its revenues and intellectual property.

165.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first and second sentences of paragraph 61 and denies the allegations of the third and fourth sentences of paragraph 61.

166.    IBM denies the allegations of paragraph 62.

167.    IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 63, except states that IBM's contracts limit the authorized use of IBM mainframe computing capacity, as described in IBM's counterclaims, and, to protect its rights against Neon's piracy, IBM has lawfully expressed its position to a number of customers.

168.    IBM denies the allegations of paragraph 64.

## Neon's Purported Causes of Action

## Lanham Act

169.    IBM repeats its responses to paragraphs 1-64.

170.    IBM denies the allegations of paragraph 66, except refers to the Lanham Act for its contents and states that Neon purports to seek to recover, *inter alia,* profits earned by IBM.

171.    IBM denies the allegations of paragraph 67, except states as follows.  Neon requested identification of IBM customer agreements that would be violated by zPrime use, and in a letter dated October 27, 2009, IBM informed Neon that use of zPrime would violate specific provisions of IBM's Machine Code License.  IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 67.

172.   IBM denies the allegations of paragraph 68.

## California Unfair Competition

173.   IBM repeats its responses to paragraphs 1-68.

174.   IBM denies the allegations of paragraph 70, except refers to Cal. Bus. & Prof. Code §§ 17200 and 17500 for their contents and states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 70.

## New York Deceptive Acts and Practices

175.   IBM repeats its responses to paragraphs 1-70.

176.   IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 72, and denies the allegations of the second sentence of paragraph 72, except refers to New York General Business Law § 349 for its contents.

177.   IBM denies the allegations of paragraph 73.

178.   IBM denies the allegations of paragraph 74.

179.   IBM denies the allegations of paragraph 75, except states that Neon purports to seek an award of damages plus attorneys' fees as well as a permanent injunction.

## Business Disparagement

180.   IBM repeats its responses to paragraphs 1-75.

181.   IBM denies the allegations of paragraph 77, except states that Neon requested identification of IBM customer agreements that would be violated by zPrime use, and in a letter dated October 27, 2009, IBM informed Neon that use of zPrime would violate specific provisions of IBM's Machine Code License.

## Tortious Interference with Prospective Contracts

182.    IBM repeats its responses to paragraphs 1-77.

183.    IBM denies the first sentence of paragraph 79, and states that customers cannot legitimately evade the fees they are contractually obligated to pay to IBM.  IBM states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the second through sixth sentences of paragraph 79.  IBM denies the allegations of the seventh, eighth and ninth sentences of paragraph 79.

184.    IBM denies the allegations of paragraph 80, except refers to the Texas Deceptive Trade Practices Act, the Lanham Act and the FTC Act for their contents.

185.    IBM denies the allegations of paragraph 81.

## Clayton Act Section 3

186.    IBM repeats its responses to paragraphs 1-81.

187.    IBM denies the allegations of paragraph 83, except refers to the Clayton Act Section 3 for its contents.

188.    IBM denies the allegations of paragraph 84, except that IBM is engaged in commerce.

189.    IBM denies the allegations of paragraph 85, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 85.

190.    IBM denies the allegations of paragraph 86.

191.    IBM denies the allegations of paragraph 87, except refers to Clayton Act Section 4 for its contents.

192.    IBM denies the allegations of paragraph 88, except states that Neon purports to seek actual and treble damages, costs and attorneys' fees.

### Section Two of the Sherman Act

193.    IBM repeats its responses to paragraphs 1-88.

194.    IBM denies the allegations of paragraph 90, except refers to Sherman Act Section 2 for its contents.

195.    IBM denies the allegations of the second sentence of paragraph 91.

196.    IBM denies the allegations of paragraph 92, except refers to https://www-304.ibm.com/businesscenter/cpe/download0/185939/ica_us.pdf for the contents thereof.

197.    IBM denies the allegations of paragraph 93, except that, as set forth in IBM's counterclaims, zPrime has the potential, and indeed its sole purpose is, to plunder licensing fees to which IBM is rightfully entitled.

198.    IBM denies the allegations of paragraph 94, except states that Neon purports to seek actual and treble damages, costs and attorneys' fees.

### Declaratory Judgment

199.    IBM repeats its responses to paragraphs 1-94.

200.    IBM denies the allegations of paragraph 96, except refers to 28 U.S.C.A. § 2201 for its contents and states that Neon purports to seek declarations as set forth in paragraph 96.

### Punitive Damages

201.    IBM denies the allegations of paragraph 97.

### Jury Trial

202.    IBM denies the allegation of paragraph 98, except states that Neon purports to demand a jury trial.

## Neon's Prayer

203.     IBM denies that Neon is entitled to any of the relief requested in paragraphs 1-10 of its Prayer for relief.

## IBM's Defenses

### First Affirmative Defense

204.     Neon's complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

205.     Neon's complaint is barred in whole or in part by the doctrine of unclean hands.

### Third Affirmative Defense

206.     Neon's complaint is barred in whole or in part by lack of standing.

### Fourth Affirmative Defense

207.     Neon's claims are barred in whole or in part because IBM's statements are privileged exercises of free speech under the United States and Texas Constitutions.

### Fifth Affirmative Defense

208.     Neon's claims are barred in whole or in part because IBM's statements are protected by IBM's right to petition under the United States and Texas Constitutions and the *Noerr-Pennington* doctrine.

*      *      *

209.     IBM reserves the right to raise any additional affirmative defenses not asserted herein of which it becomes aware during the course of this action.

## IBM'S PRAYER FOR RELIEF

WHEREFORE, IBM respectfully requests that this Court enter judgment in its favor as follows:

A.    Dismissing with prejudice Plaintiff's Amended Complaint in its entirety;

B.    Granting permanent injunctive relief, enjoining Neon, its officers, agents, servants, employees and attorneys, and other persons acting in concert or participation with them, from infringing IBM's copyrights, marketing and selling zPrime, interfering with IBM's customer contracts and/or engaging in false advertising;

C.    Awarding IBM damages in an amount to be determined at trial, including compensatory damages, punitive damages and lost profits;

D.    Awarding IBM threefold the actual damages determined at trial pursuant to 15 U.S.C. § 1117(a);

E.    Awarding IBM the profits earned by Neon, and ordering that an accounting of Neon's profits be rendered;

F.    Awarding IBM prejudgment interest on any amounts recovered pursuant to the preceding paragraphs;

G.    Declaring this an exceptional case and awarding IBM its reasonable attorneys' fees associated with this action pursuant to 17 U.S.C. §§ 1203(b), 505 and 15 U.S.C. § 1117(a);

H.    Awarding IBM its attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code;

I.    Awarding IBM its costs of court incurred as a result of this action, and prejudgment and post-judgment interest in the maximum amount allowed by law; and

I.    Awarding IBM such other and further relief as this Court deems just and proper.

43

Dated:  March 8, 2010

Respectfully submitted,


  /s/ *Shannon H. Ratliff*_____
Shannon H. Ratliff
State Bar No. 16573000
Ryan A. Botkin
State Bar No. 00793366
RATLIFF LAW FIRM, P.L.L.C.
600 Congress Avenue, Suite 3100
Austin, TX 78701
Phone:  (512) 493-9600
Fax:  (512) 493-9625
Email: sratliff@ratlifflaw.com
           rbotkin@ratlifflaw.com

and

  /s/ *R. Paul Yetter*_____ _____
R. Paul Yetter
State Bar No. 22154200
Collin J. Cox
State Bar No. 24031977
YETTER, WARDEN & COLEMAN, L.L.P.
909 Fannin Street, Suite 3600
Houston, Texas 77010
Phone:  (713) 632-8000
Fax:  (713) 632-8002
Email: pyetter@ywcllp.com
           ccox@ywcllp.com


ATTORNEYS FOR INTERNATIONAL
BUSINESS MACHINES CORPORATION

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
Email: echesler@cravath.com
           rstark@cravath.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served upon all counsel of record via the Court's ECF filing system on March 8, 2010.

Chris Reynolds
Jean C. Frizzell
Jeremy L. Doyle
REYNOLDS, FRIZZELL, BLACK, DOYLE, ALLEN & OLDHAM LLP
1100 Louisiana, Suite 3500
Houston, Texas 77002

*Counsel for Plaintiff-Counterclaim Defendant*
*Neon Enterprise Software, LLC*

/s/ Shannon H. Ratliff
Shannon H. Ratliff
