IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **NEON ENTERPRISE SOFTWARE, LLC** | § | |
| | § | |
| V. | § | A-09-CA-896  AWA |
| | § | |
| **INTERNATIONAL BUSINESS** | § | |
| **MACHINES CORPORATION** | § | |

**ORDER**

Before the Court is IBM's Motion to Produce (Clerk's Doc. No. 178); Response in Opposition to Motion (Clerk's Doc. No. 181); and Reply to Response to Motion (Clerk's Doc. No. 186). On September 23, 2011, the Court held a hearing on the aforementioned pleadings and allowed the parties to submit additional briefing, which each side did: IBM's Supplemental Response in Support of Its Opposed Motion Concerning Injunction-Related Information (Clerk's Doc. No. 200) and Neon's Reply to IBM's Supplemental Response (Clerk's Doc. No. 202). IBM also filed an advisory to the Court (Clerk's Doc. No. 206), and Neon responded (Clerk's Doc. No. 207). After hearing the parties' arguments and reviewing the parties' briefs, relevant case law, as well as the entire case file, the undersigned submits the following order.

**I.     Background**

Because there are numerous prior orders setting out the history of this case, the Court will limit itself here to the facts salient to this dispute. Shortly before the scheduled trial of this case, the parties reached an agreement to settle, and on May 31, 2011, IBM submitted an unopposed motion for the entry of a permanent injunction against Neon (Clerk's Doc. No. 163). After a brief record proceeding, the Court entered that injunction (Clerk's Doc. No. 165). The parties then filed a stipulation of dismissal agreeing to the dismissal of all claims in the case with prejudice (Clerk's

Doc. No. 166). After the flurry of paper that had passed over the undersigned's desk the months immediately preceding the trial date, the Court was eager to give its attention to other portions of its docket. Unfortunately, the dismissal did not end the case. Less than two months after the dismissal, IBM filed its motion to produce, seeking documents it claimed were necessary to ensure that Neon was complying with the settlement agreement, and seeking permission to use documents already in its possession beyond the scope of the permissions granted by the Protective Order in the case. Neon opposed the motion, arguing that IBM was effectively trying to re-trade the settlement agreement and obtain benefits beyond those for which it had bargained in the settlement. The Court held a hearing on the motion on September 23, 2011, which sparked a new round of briefing that was complete by the end of November.[1]

      As far as the production of materials is concerned, initially there was a dispute regarding whether Neon would provide IBM with copies of all of its zPrime license agreements and copies of correspondence Neon sent to customers in compliance with its settlement obligations. At the September hearing, however, Neon announced that it would give IBM's counsel the agreements and correspondence, designated as "Attorneys' Eyes Only" under the Protective Order. There do not appear to be any other documents IBM is demanding Neon produce to it. Thus, although labeled as a motion to produce, the motion is more appropriately viewed at this point as a motion to modify the Protective Order, as the only issue which remains for decision is whether IBM should be permitted to share the documents with persons not identified in the Protective Order as permitted recipients of confidential documents.

---

[1] The Court hoped to have resolved this motion by year's end, and apologizes to the parties for the delay in this ruling. Unfortunately, the Austin Division's large docket and the existing magistrate judge vacancy have led to unfortunate delays in the Court's civil docket.

The documents at issue are best analyzed by category. The first is material Neon was obligated to provide IBM pursuant to the Settlement Agreement. There are three groups of documents in this category: (1) Neon's zPrime customer list;[2] (2) information regarding payments received from zPrime customers after the date of the Settlement Agreement;[3] and (3) copies of the zPrime code.[4] The second category is material produced or created during the litigation—specifically, the reports of two IBM experts which rely upon and discuss confidential Neon information (mainly related to zPrime code). The final group of documents does not fall neatly within either of the first two categories. This group is made up of Neon's license agreements with all of its zPrime customers, along with correspondence between Neon and these customers after the lawsuit was settled. As noted, Neon ultimately dropped its objection to producing these documents, but delivered the documents to IBM with the understanding that, until further ruling by the Court, access to the material would be limited to the "Attorneys' Eyes Only" group.[5] IBM requests that the Court permit it to give access to all three categories of documents to certain employees on the

---

[2]Neon first provided this information to IBM in a response to an interrogatory during the litigation. Independent of this, the Settlement Agreement contained an attachment (Exhibit C) that Neon warranted to be a "complete and accurate list of all licensees and customers of zPrime." Settlement Agreement, Clerk's Doc. No. 179-1, 9. This latter customer list is the one at issue here.

[3]The Settlement Agreement requires that "any payment or other proceeds" Neon receives related to zPrime be segregated and transferred to IBM, and further requires Neon to "promptly provide IBM with the identity of any licensee or customer making any such payment or providing such proceeds." *Id.* at 6.

[4]The Settlement Agreement mandates that "Neon shall provide IBM with the source, object and executable code and listings for each and every version or release of zPrime upon the execution and delivery of this Agreement." *Id.* at 4.

[5]*See* Transcript of September 23, 2012 hearing (Clerk's Doc. No. 197) at 46, 58–59, 60–61.

"business side" of IBM who are charged with attempting to collect additional usage fees IBM contends are owed by the IBM customers who purchased and used zPrime.

Neon urges the Court to deny IBM's request. Neon argues that all of the documents are within the scope of the Protective Order (Clerk's Doc. No. 25), and this prevents IBM from further disclosing any of the information absent modification of that document. And Neon contends there are three reasons why the Court should not modify the Protective Order: (1) IBM is seeking through modification a benefit it did not negotiate for during the settlement negotiations; (2) IBM has audit rights under its license agreements with its customers and can obtain the requested information through that process; and (3) permitting IBM employees access to the zPrime customer material exposes Neon to suit by its customers for disclosing their confidential information.[6]

## II.   Are documents produced pursuant to the Settlement Agreement subject to the Protective Order?

Three of the categories of documents at issue were delivered to IBM by Neon pursuant to the Settlement Agreement. IBM contends that these records are not subject to the Protective Order, and the only limitation on IBM's use of these documents is that contained in the confidentiality clause of the Settlement Agreement. Neon disagrees, and argues that these documents are within the express scope of the Protective Order.

The Protective Order was jointly prepared by the parties. In the motion seeking its entry, the parties stated that because "discovery in this action is likely to involve the production of highly confidential information," they had "negotiated and agreed to the terms of [a] Protective Order," and

---

[6]It has not been lost on the Court that Neon is surely less than eager to see IBM obtain additional charges from Neon's former customers for the fees they avoided using software Neon sold them, with promises of its legitimacy. Plainly, Neon has no desire to do anything that would aid IBM in that effort, and that too has likely helped inform Neon's position on this motion.

asked that the Court approve its terms and sign it. Clerk's Doc. No. 25 at 1. The Protective Order is thus a hybrid document, as it is both a contract between the parties, and an order of the Court. It would therefore be reasonable to apply normal contract construction principles in construing it. The first rule of contract construction is that courts should effectuate the intent of the parties, and the best way to do so is to give the words contained within the four corners of the contract their plain and reasonable meaning. *E.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990); *Caldwell v. Curioni*, 125 S.W.3d 784, 792 (Tex. App.—Dallas 2004, no pet.).

The most relevant language of the Protective Order on this subject is contained in Section 2, which is titled "Scope of Order."

> This protective Order governs the handling of all documents, discovery products . . . deposition testimony, pleadings, exhibits of any kind, presentations, computer readable data storage media, and other information . . . ***produced, given or filed during discovery and other proceedings*** in this Action.

Clerk's Doc. No. 28 § 2 (emphasis added). IBM contends that the Settlement Agreement and its attachments were not "produced, given or filed during discovery [or] other proceedings in this Action," and therefore they are not within the scope of the Protective Order. Notably, the Settlement Agreement was not filed with the papers of the Court (until the instant dispute arose when it was filed as an exhibit to IBM's motion). Considering the Settlement Agreement to be subject to the Protective Order does create some anomalies. For example, the Settlement Agreement is not marked or otherwise designated as "Highly Confidential Information," as § 4 of the Protective Order would contemplate for a document within its ambit. It is also nonsensical for the parties to "return" the Settlement Agreement to the "Designating Party," as required by § 13 of the Protective Order, and

the Settlement Agreement contains a confidentiality provision, which would be redundant if the Settlement Agreement was covered by the Protective Order.

The parties also focus on whether the Settlement Agreement was part of the "proceedings" of the action, as the Protective Order only applies to documents "produced, given or filed during discovery and other proceedings" in the case. Since the Settlement Agreement plainly was not "produced, given or filed" during discovery, to fall within the ambit of the Protective Order it would have to have taken place within "other proceedings" in the case. "Proceedings" is not defined in the Protective Order. According to Black's Law Dictionary, "proceeding" means the "regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." BLACK'S LAW DICTIONARY 1324 (9th ed. 2009). Arguably the Settlement Agreement is what led to the termination of the case, and thus is an "event[ ] between the time of commencement and the entry of judgment," making it a "proceeding" under this definition. But this is a somewhat hyper-technical construction of "proceeding," as the Court played no part in the Settlement Agreement—which was negotiated and drafted solely by and between the parties—and thus it is odd to consider it part of the "proceedings" in the case.

Reading the entirety of phrase in context supports this conclusion. The scope provision states that the Protective Order applies to materials "produced, given or filed during discovery and other proceedings." The Settlement Agreement was not "given" or "filed" during the proceedings in the case, leaving only the question of whether it was "produced" in the case.[7] The use of "produced"

---

[7] As noted earlier, the Settlement Agreement was attached as an exhibit to IBM's motion, and thus it is now "filed" as part of the papers in this case. But the terms of the document itself did not contemplate that it would be filed absent some sort of disagreement. Rather, all that the Settlement Agreement contemplated being filed was the Permanent Injunction and Stipulation of Dismissal.

in this context clearly does not mean "created," or, to quote the Oxford English Dictionary, "to bring into being or existence."[8] Rather, it is being used in the more typical legal manner as meaning to "deliver," or "present," particularly as it applies to discovery.[9] It truly stretches the Protective Order beyond its terms to say that the Settlement Agreement was "produced . . . during . . . proceedings" in this case. The more plain reading of the relevant language of the Protective Order results in the conclusion that the Settlement Agreement was not produced, given or filed during proceedings in this case, and thus that it is not within the scope of the Protective Order's restrictions. Thus, whether IBM may use the zPrime customer lists, post-injunction payment information, and the zPrime code for purposes other than this litigation is governed by the terms of the Settlement Agreement, not the Protective Order. Neon does not appear to contend that the confidentiality provision of the Settlement Agreement prohibits the type of use of these three categories of material that IBM contemplates, and that would seem to settle the matter.

Neon does argue, however, that it continues to have certain rights in the zPrime code, and that it has not transferred those rights as part of the settlement. The language of the Settlement Agreement relevant to the code states:

> Neon shall provide IBM with the source, object and executable code and listings for each and every version or release of zPrime upon the execution and delivery of this Agreement, and immediately thereafter, Neon (including its subsidiaries, affiliates, and related entities) shall destroy or cause to be destroyed all other copies of the source, object and executable code of zPrime (and any similar code for any software,

---

[8] *See* definition of "produce" (3)(a), OXFORD ENGLISH DICTIONARY (3d ed. 2007), *available at* http://www.oed.com/view/Entry/151978?rskey=HuKeUZ&result=2&isAdvanced=false#eid.

[9] *See id.* "produce" (2)(a) ("To bring forward or out, to present to view or notice; to show or provide (something) for consideration, inspection, or use; to exhibit; *spec.* to bring (a witness or evidence) before a court a law.").

>product or device with functionality similar to that of zPrime) from all computer systems and storage devices in its possession, custody or control.

Settlement Agreement, Clerk's Doc. No. 179-1, at § 3(B). The Settlement Agreement also allows IBM to retain copies of zPrime and allows IBM to use the software:

>Notwithstanding anything to the contrary contained in this Agreement, IBM shall not be prohibited in any respect from implementing or maintaining technological or other measures that prevent or protect against or otherwise disable any software, product or device that directs, routes, transfers, enables or in any way facilitates workloads not expressly authorized in writing by IBM to run on Specialty Engines.

*Id.* at § 9(A). The first of these provisions strips Neon of virtually any interest it could have in zPrime (at least with respect to IBM), and the use IBM makes of zPrime. It is difficult to see how Neon can contend that it has any standing to object to whatever use IBM makes of zPrime, when it agreed to deliver to IBM all versions of zPrime, and to destroy all of Neon's copies of it. And the fact that zPrime may contain code that was authored by Neon, and is common to other Neon-created software, does not alter this.[10]

For all of these reasons, the Court concludes that the documents delivered as part of the Settlement Agreement are not governed by the Protective Order.

---

[10]The Court need not—and does not—make any determination concerning whether Neon has any intellectual property rights in any portions of zPrime code that might be common to other Neon products. The only issue presented here is whether IBM may make use of zPrime for the business purposes IBM has identified: obtaining payment from IBM customers who used zPrime to circumvent processing fees. Because resolving that question does not require resolving the larger issue of what rights, if any, Neon retains in any portion of the zPrime code, the Court offers no opinion on that topic.

### III.    Should the Court modify the Protective Order?[11]

There is no dispute that the remaining documents at issue—IBM's two expert reports, Neon's zPrime license agreements, and its post-injunction correspondence with those customers—are within the scope of the Protective Order.[12]  Whether IBM should be allowed to distribute those documents beyond the limits set by the Protective Order thus depends on whether the Court should modify the Protective Order.

There is no definitive test a court should apply in deciding whether to modify a protective order, though there are many district court decisions addressing motions like the instant one.  Some courts have approached the issue more methodically than others.  For example, one judge in the Southern District of Texas has identified factors that courts commonly consider in deciding whether to modify a "blanket" protective order (like the one at issue here): (1) the nature of the protective order ( i.e., narrow vs. broad, court imposed vs. court approved); (2) the foreseeability at the time of the original protective order of the modification now requested; and (3) the parties' reliance on the protective order.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2009 WL 3247432, at *2–3 (S.D. Tex. Sept. 29, 2009) (citing *Holland v. Summit Autonomous, Inc.*, 2001 WL 930879, at *2–3

---

[11] Neon questions IBM's ability to petition the court for a modification of the protection provided to documents produced under the Protective Order.  The Order, however, explicitly contemplated that possibility.  *See* Clerk's Doc. No. 28 § 15 ("Nothing herein shall prevent disclosure beyond the terms of this Protective Order . . . if the Court, after notice to all affected parties, orders such disclosure.").

[12] Neon produced the license agreements and correspondence with the understanding that it was doing so on the basis that IBM would treat the documents as confidential under the Protective Order, and IBM agreed to treat them as such, subject to IBM's ability to seek to demonstrate good cause to distribute them more widely within IBM.  Accordingly, the analysis with respect to the license agreements and correspondence will be the same as if they had been produced during the litigation.

9

(E.D. La. Aug. 14, 2001); *Schafer v. State Farm & Fire Cas. Co.*, 2009 WL 650263 (E.D. La. Mar. 11, 2009). Importantly, while these three factors are commonly considered by courts, they are by no means the only criteria a court should consider. Factors such as the continued need for confidentiality, the prejudice that would be suffered and the benefit gained through a modification, and the overall equities of the case, are also valid considerations.

In deciding where to place the burden of proof, Judge Harmon in the *Enron* case adopted the test identified by Judge Africk in *Holland*, which focuses on whether there was a requirement of demonstrating good cause to support the issuance of the protective order in the first instance. *Id.* at *3. If good cause was shown for the original protective order, then the burden should be on the party seeking modification, and if good cause was not shown for the original protective order, the burden of showing good cause should be on the party seeking continued confidentiality. *Id.* Here, the Protective Order here was entered at the joint request of the parties. As a result, there was not any significant presentation made in support of its entry. Having said this, the parties' stated reason for the Protective Order—to protect their respective trade secrets—is the very sort of argument traditionally made to demonstrate good cause for protecting documents from public view. From this, the Court finds that good cause was shown for the entry of the Protective Order, and thus the burden to demonstrate good cause to modify the Protective Order should be on IBM.

Judge Africk's approach in *Holland* considered, among other factors, the type of protective order at issue, differentiating between "umbrella," "blanket," and "narrow" orders. *Holland*, 2001 WL 930879, at *2-3. The Protective Order here was a "blanket" order (*i.e.*, one that permits the parties to unilaterally designate material as "confidential"), which favors permitting its modification. When a "narrow" order, targeted at specific material, is entered, a court should be reluctant to later

reverse the protection provided to these materials. On the other hand, when the court enters a blanket order, there is less of a presumption against reversing that protection later. As Judge Harmon explained it:

> Here, because the orders in dispute were stipulated by the parties and approved by the Court, the parties, not the Court, designated which documents would be marked "confidential." This Court has previously observed, "It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public" but that Rule 26(c) allows a federal judge to reject this presumption where good cause is shown. Where the court has "entered a blanket stipulated protective order pursuant to Rule 26(c)[,][s]uch blanket orders are inherently subject to challenge and modification, as the party resisting disclosure generally has not made a particularized showing of good cause with respect to any individual document."

*Id.* at *3 (citations and internal quotations omitted). Further, it was foreseeable to all parties at the time of the original protective order that a modification could occur, as the Protective Order—agreed to by all parties—explicitly permitted that. *See* Clerk's Doc. No. 28 § 15 ("Nothing herein shall prevent disclosure beyond the terms of this Protective Order . . . if the Court, after notice to all affected parties, orders such disclosure."), and § 12 (permitting declassification of material after challenge). As the parties contemplated the Court modifying the Protective Order, this factor also favors permitting modification.

The third factor the *Enron* court identifies—reliance—is one on which Neon focuses. Neon argues that it relied on the Protective Order, and the secrecy it provided, when it settled the case. Neon asserts that IBM plainly could have—indeed, should have—anticipated its need (or desire) for this modification at the time of the settlement of the case, and thus should have negotiated for that relief then. Neon further contends that had IBM sought such relief as part of the settlement of the case, Neon would not have agreed to it. And Neon argues that IBM requesting the modification just

a few short months after the settlement demonstrates that IBM in fact considered its need for the modification during the settlement negotiations, but declined to bargain for it. IBM responds that the issue did not arise during the settlement discussions, and thus simply was not a part of the negotiations, and that fact should play no part in the Court's analysis. On balance, the Court concludes that it is likely that Neon relied on the protections of the Protective Order when it delivered the materials at issue to IBM in this case, and it did not contemplate that the protection would be eliminated later, and in that sense the reliance factor weighs in Neon's favor, though not with great weight, given that the terms of the Protective Order (which Neon supported) explicitly permitted modification. Put differently, whatever reasonable reliance Neon was entitled to place in the Protective Order was limited by the fact that the order contained a modification clause.[13]

Whether there is a continued need for confidentiality is perhaps the most important factor in this analysis. The very reason that a court enters a protective order is because there is a legitimate need for protecting the confidentiality of the records at issue. If that need no longer exists, then the very reason for the protective order no longer exists. Here, there are two groups of documents at issue—the two IBM expert reports, and Neon's zPrime license agreements and post-injunction correspondence. With regard to the expert reports, the only reason IBM designated those as confidential was to protect Neon's professed trade secret interest in zPrime and its operation, as well

---

[13]The Court is not persuaded that IBM's failure to request the modification of the Protective Order during the settlement negotiations is relevant to this analysis. The Protective Order already contained a provision permitting its modification, through the means of a court order, and thus IBM had no need to bring up the topic during settlement, so long as it was willing to make the showing required by the Protective Order and case law to obtain the modification.

as in zPrime customer data.[14] Given the outcome of the case—Neon agreeing to stop selling zPrime, to transfer all copies of it to IBM, and to take all steps possible to stop customers from using it—Neon has little, if any, continued interest in the confidentiality of zPrime code (at least vis-a-vis IBM). Accordingly, there is little (if any) need to protect zPrime material from use by IBM at this point. Similarly, the Hadaway report was designated confidential presumably because it contains zPrime customer information regarding their use of zPrime and the workloads they diverted with it. Given Neon's departure from the zPrime market, and the fact that IBM has its own relationship with these customers, including contract rights to audit their systems, there is little continuing need to keep this information from IBM employees who have a legitimate need for it, particularly when that need flows out of Neon's conduct that initiated the lawsuit in the first instance. The case is different, however, with regard to the license agreements and correspondence. Those agreements were entered into between Neon and third parties, and contain confidentiality clauses. Nothing in the outcome of the litigation has lessened the need for the continued confidentiality of these agreements.

Another relevant consideration is the balance between the prejudice Neon will suffer from disclosure, and the benefits IBM would obtain. As already explained, given Neon's minimal continued interest in zPrime, it would suffer little, if any, prejudice from employees on IBM's business side receiving access to the expert reports. IBM retained the experts, and paid for their work, and the documents were sealed mainly to protect Neon's interest in zPrime as a trade secret. On the other hand, IBM would receive a significant benefit from the modification, as it would not

---

[14]*See* Neon's Response (Clerk's Doc. No. 181) at 9–10. To the extent that the Alepin and Hadaway reports were designated confidential to protect IBM trade secrets, that issue is irrelevant to the analysis, given that IBM's motion only seeks to make the information available to IBM employees, who presumably are already obligated to maintain the confidentiality of IBM trade secrets.

have to recreate the expert reports from scratch, and it could use that information to attempt to collect fees it contends are owed to it by the mainframe owners that bought zPrime. The fact of a tangible benefit to IBM and little or no competing detriment to Neon supports a finding of good cause for modifying the Protective Order.

Once again, the case is not the same with the license agreements. IBM has failed to articulate a persuasive basis for needing access to the documents. The only potential need for the license agreements IBM has identified is that if any of its customers claim not to have purchased or installed zPrime, IBM could demonstrate the falsity of such claims by producing a copy of the license agreement. But IBM already has available to it the customer list made part of the Settlement Agreement, and, more importantly, any such benefit is marginal at best, given that IBM has audit rights under its contracts allowing it access to the customer's mainframe, which surely is a more direct way of proving the falsity of any such claim. On the other hand, the potential prejudice to Neon from giving wider access to the license agreements is real. The evidence provided to the Court shows that Neon faces potential legal liability from its customers if it breaches the confidentiality of the license agreements.

Finally, the last consideration—the relative equities in the case—runs in IBM's favor. The Court need not spend much time on this issue. As the parties are aware, the settlement of the case followed discovery tending to show that Neon had reverse assembled IBM code to create its zPrime product, in violation of Neon's contract with IBM, and then attempted to destroy evidence of this reverse assembly when IBM sought it in this case. One can infer from the structure of the settlement—which required Neon to pull zPrime from the market, destroy its copies, and take all steps it could to end zPrime's use—reflects that the equities here are plainly on IBM's side. It is thus

not unreasonable to allow IBM to make use of material Neon originally designated as confidential so that IBM can recover monies from customers that avoided charges through use of zPrime.

While IBM has shown good cause to modify the terms of the Protective Order with regard to the two expert reports, this does not mean that it should be permitted to make any use of the material it desires. Rather, the use permitted should be limited to the need IBM has articulated, and relied upon, in its motion. Thus, the Court will permit a wider—but not unlimited—use of the reports by IBM.

## IV.   Conclusion

Accordingly, the Court GRANTS IBM's Motion to Produce (Clerk's Doc. No. 178). IBM is permitted to make the expert reports of Hadaway and Alepin, as well as the zPrime customer list, Neon post-injunction payment information, and zPrime code, available to IBM employees with a "need to know" of the information for purposes of collecting alleged outstanding charges owed to IBM by zPrime users. No use beyond this shall be permitted. IBM shall treat employees gaining access to the materials similar to the manner in which experts receiving confidential materials are treated under § 8 of the Protective Order. That is, IBM shall make a record of employees receiving the materials, and those employees must sign an agreement similar to that contained in Exhibit A to the Protective Order (but revised appropriate to the context set by this order), agreeing to be bound by the terms of this order. In all other respects, the motion is DENIED.

SIGNED this 13th day of February, 2012.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE